UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-MJ-02479-JJO-1

UNITED STATES OF AMERICA,

             Miami, Florida

    Plaintiff(s),

             March 19, 2021

  vs.

PRENTISS K. MADDEN,

    Defendant(s).  Pages 1- 63
------------------------------------------------------------

HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE CHRIS M. MCALILEY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S): CHRISTOPHER HUDOCK, ESQ.
           UNITED STATES ATTORNEY'S OFFICE
           101 South U.S. Highway 1
           Fort Pierce, FL 34950
           786-360-9806
           christopher.hudock@usdoj.gov


FOR THE DEFENDANT(S): DANISE PONTON, ESQ.
           DANISE PONTON, P.A.
           815 Ponce de Leon Boulevard
           Coral Gables, FL 33134
           danise_ponton@yahoo.com


TRANSCRIBED BY:   Joanne Mancari, RPR, CRR, CSR
           Court Reporter
           jemancari@gmail.com

```
 1                    INDEX OF EXAMINATION

 2   WITNESS:

 3   LEAH ORTIZ

 4   Cross By Ms. Ponton  . . . . . . . . . . . .23

 5   Redirect By Mr. Hudock . . . . . . . . . . .25

 6   WILLIAM SAMEK

 7   Direct By Ms. Ponton . . . . . . . . . . . .32

 8   Cross By Mr. Hudock  . . . . . . . . . . . .38

 9   MARILYN VOLKER

10   Cross By Mr. Hudock  . . . . . . . . . . . .55

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon,

2    the following proceedings were held via Zoom videoconference:

3              THE COURT:  This is Prentiss Madden, case No. 21 2479.

4              Government counsel, would you please state your

5    appearance.

6              MR. HUDOCK:  Good morning, your Honor.  Chris Hudock

7    on behalf of the United States.

8              THE COURT:  OK.  Do we have defense counsel?

9              MS. PONTON:  Yes.  Good morning, your Honor.  Danise

10   Ponton on behalf of Mr. Madden.

11             THE COURT:  OK.  Mr. Madden, before we go forward with

12   this hearing, I need to ask, do I have your consent, sir, to

13   our holding the hearing by videoconference?

14             THE DEFENDANT:  Yes.

15             THE COURT:  OK.  Very good.

16             So, Ms. Ponton, have you entered a permanent

17   appearance?

18             MS. PONTON:  No, your Honor.  I entered a temporary

19   appearance for the purposes of this detention hearing.

20             THE COURT:  OK.  So we are going to have to -- the

21   arraignment is on March 31st.  We are going to schedule you for

22   a report regarding counsel on that date.  Make sense?

23             MS. PONTON:  OK.  Thank you.

24             THE COURT:  OK.  You want to go forward with a

25   detention hearing?

1          MS. PONTON:  I believe Mr. Hudock wanted to speak to

2     that, but I am prepared to go forward on the detention hearing

3     today, yes.

4          THE COURT:  Mr. Hudock, go ahead.

5          MR. HUDOCK:  Yes, your Honor.  We learned this morning

6     of one expert that the defense intended to call for this

7     hearing today and actually during this hearing we learned of a

8     second expert.  Neither of those experts have provided us with

9     reports.  We have only received one CV as to the first expert.

10    So if your Honor would be so inclined, we would be asking for a

11    continuance to be able to interview those experts and receive

12    their reports until next week, preferably Tuesday or Wednesday.

13    If not, we would ask for the opportunity to at least interview

14    them in a breakout room before going forward with the hearing.

15         THE COURT:  Right.  Right.

16         Well, Ms. Ponton, sounds reasonable to me.  Any

17    objection to that?

18         MS. PONTON:  Well, I certainly don't have an objection

19    to their participation here today with a breakout room.  I just

20    want to say that I did coordinate the experts and their

21    appearances and obviously they had to kind of move schedules

22    around.  It is not an easy task to get such experts to commit.

23         I certainly understand if he wants to speak to the

24    experts, to take the breakout room.  I just want to be clear

25    that I even have a third option if that is necessary.  I am

1    just trying to make sure I address the court's concerns as I go

2    through based on the nature of the charges, your Honor.  So

3    since I have the third person, that person had a session that

4    was going to take place at 12.  That was actually Dr. April

5    Young.  If he wants to speak to Dr. April Young first, that

6    would be great and we could continue from there, if your Honor

7    would be so inclined.  Or if you just want me to go on the

8    first two, that is fine as well.

9         THE COURT:  What kind of experts are these?

10        MS. PONTON:  So, your Honor, the charges are

11   distribution of child pornography and animal crushing and

12   possession of child pornography.  I have three experts who

13   are -- one of the experts was someone who actually has treated

14   Mr. Madden in the past.  She doesn't have any reports.

15        THE COURT:  What is the expertise?  So this is a

16   treating physician?

17        MS. PONTON:  Right.  Her degree is an EDD.  She has a

18   doctorate in -- her name is Marilyn Volker and she acted as his

19   sexologist, like sex therapist.

20        THE COURT:  OK.

21        MS. PONTON:  And then Dr. William Samek I have on the

22   line.  He is a Sc.D.  He is a clinical and forensic

23   psychologist.  He does sex offender therapies.  He's been doing

24   this type of work for like 40 years.

25        THE COURT:  OK.  Wait.  His name is, tell me again.

1          MS. PONTON:  William Samek is the last name.

2    S-A-M-E-K.

3          THE COURT:  OK.

4          MS. PONTON:  Then lastly --

5          THE COURT:  His expertise, I'm sorry, is a forensic

6    psychologist?

7          MS. PONTON:  Yes, clinical and forensic psychologist.

8    Correct.

9          THE COURT:  All right.

10          MS. PONTON:  Then Dr. April Young I have on the line

11   kind of just as a fail-safe in case these concerns came up.

12          Dr. April Young kind of confirmed today that she could

13   be part of a team in the event that we needed a team for

14   treatment purposes.  She is a licensed mental health counselor.

15   She is also a Sc.D in clinical sexology.

16          I'm sorry.

17          Furthermore, she actually has been approved and works

18   with the Bureau of Prisons when sentencing happens.  So she

19   does sex offender treatment with the Bureau of Prisons already

20   through Jacksonville and Palm Beach.

21          So just in case that became an issue, I have a lot of

22   options to offer your Honor to discuss a combination of

23   conditions to rebut the presumption, your Honor.

24          THE COURT:  So Ms. Young you'd say would be relevant

25   to her providing some sort of support and treatment if

1   Mr. Madden is released on a bond.  That is kind of her role in

2   this discussion?

3          MS. PONTON:  Yes.

4          THE COURT:  And Ms. Volker, is she testifying

5   particularly about interactions with Mr. Madden or more

6   generally?

7          MS. PONTON:  I think specifically with interactions

8   with Mr. Madden and his reaction when there was a search

9   warrant served a few weeks ago, he went straight to go

10  reconvene his therapy issues and deal directly with what was

11  coming.  Mr. Madden didn't go anywhere.  He went immediately to

12  solving the problem, dealing with the issue, contacting

13  counsel.

14         THE COURT:  Dealing with Ms. Volker.

15         MS. PONTON:  Yes.

16         THE COURT:  That she had -- OK.  So Ms. Volker, has

17  she been providing counseling to the defendant?

18         MS. PONTON:  In the recent weeks, yes, and she had

19  previously counseled him I think before the time that is

20  discussed in the complaint.

21         THE COURT:  OK.

22         MS. PONTON:  So whatever issues were existing, he at

23  some point in his life went to go address those issues.  At

24  some point I think he had some, not trauma but very stressful

25  stressors in his life that kind of, you know, turned into

1    something else and I think he lost touch with Dr. Volker at

2    that time.

3              THE COURT:  OK.  And then is it Dr. Samek?

4              MS. PONTON:  Correct.

5              THE COURT:  Does he have personal knowledge of the

6    defendant?

7              MS. PONTON:  No, he currently does not have a personal

8    relationship.  However, he has agreed to be able to be a

9    continuing counselor and therapist and psychologist so that

10   there is what Dr. Volker explained to me as a team in place to

11   address the issues of concern.

12             THE COURT:  OK.  All right.  So that little overview

13   helps me.

14             I didn't know if you knew that part, Mr. Hudock.

15             MR. HUDOCK:  No, your Honor, I did not.  In fact, I

16   was unaware that Dr. Young was going to be a part of this

17   hearing until she was introduced by counsel.

18             THE COURT:  Right.

19             MR. HUDOCK:  We would like to put on the record that

20   we would object to all of these experts at this time for a

21   variety of reasons.

22             First, that we haven't had, as we indicated, an

23   opportunity to interview them or review their reports, but also

24   because their testimony would be irrelevant for the purposes of

25   a detention hearing.  In this particular instance, by counsel's

1    own representation, these people have not had an opportunity to

2    speak with the defendant directly or evaluate his conduct.  And

3    as to Dr. Volker in this particular situation, she has not been

4    able to evaluate his psychological state, only acting as a

5    sexual therapist for the defendant, and wouldn't be able to

6    testify about whether or not he posed either a danger to the

7    community or a risk of flight.

8         THE COURT:  Right.  OK.  I am not going to rule that

9    out yet because I don't know enough, right.

10        I think the defense has a right to present the

11   information they want to present.  Honestly, I have never had

12   an expert testify at a detention hearing so I haven't even

13   thought about -- all my rules of experts that I am familiar

14   with are in civil proceedings, not in criminal ones.  So I

15   don't know that legally there is a right to interview them in

16   advance.

17        Here is the practicalities of this.  If I hear from

18   them and hear the defense, hear the whole presentation and my

19   mind is open to the defendant's release on a bond, I am going

20   to want -- I think it is going to make some sense for the

21   government to be able to speak more with these individuals.  So

22   I don't think on this Friday -- I am getting the feeling that

23   this is a little complicated, and I suspect that if we could

24   start with the hearing now, we could hear the presentation and

25   then depending on what I hear and my thoughts at the time, we

1    could continue this to next week.

2            That might provide -- look, if there is going to be,

3    if what I am hearing is a proposal the defendant be released

4    with a lot of psychological support and expectations, then I

5    think I am going to want Pretrial Services probably to be

6    talking to them about this and maybe government counsel too.

7            So this is a long way of saying I think there are two

8    ways of doing this.  We could start the hearing now -- you will

9    have the benefit of what they say, Mr. Hudock -- and possibly

10   continue it next week.  I am not inclined to release the

11   defendant without you, Mr. Hudock, and Pretrial Services having

12   a chance to speak with the folks who would be supporting him.

13           If I thought, accepting everything as true that the

14   defendant presents, that I nonetheless think he should be

15   detained, I could reach that decision today, right.  So that is

16   how we would proceed today, or we can continue this to next

17   week and give a chance for a little more communication.

18           If we start the hearing with me, then it stays with

19   me.  It will not go to another judge.  Those are the rules of

20   the road here.

21           MR. HUDOCK:  Your Honor, that is acceptable to the

22   government.  We would be fine with starting today with the

23   understanding that we would have the opportunity to speak to

24   the witnesses and continue the hearing next week if necessary.

25           THE COURT:  All right.  You want to do that,

1    Ms. Ponton?

2         MS. PONTON:  Yes, your Honor.  I'd prefer that.  I

3    have been here and it's just --

4         THE COURT:  Yes.  I understand.  I understand, and

5    they have been waiting.  Unfortunately, there are more

6    detention hearings that follow, but what can you do.

7         Let me just make a couple of notes here.

8         MS. PONTON:  I will do my best, your Honor, to proffer

9    what I can, giving everyone the opportunity to question these

10   individuals.  I mean, right now we are just discussing release

11   right now.  So I don't think each witness will take incredibly

12   long.

13        THE COURT:  Right.  Succinctness is a really good

14   thing.  Keeping a good focus on what is really at issue here.

15        OK.  Mr. Madden, I don't even remember now if I asked

16   you, do I have your consent to our proceeding by

17   videoconference?

18        We had you muted.  Let's get you unmuted.

19        Maybe everybody else remembers that he already told

20   me.  I am getting nods here.  You already told me that.  OK.

21        All right.  So what we are going to do is we are going

22   to start with Mr. Hudock, your proffer of testimony, and tell

23   me, sir, on what grounds are you asking that Mr. Madden be

24   detained.

25        MR. HUDOCK:  Yes, your Honor.  We're seeking detention

1   based on a presumption as a result of this offense involving a

2   minor victim.  That is pursuant to 18, United States Code,

3   3142(e)(3)(E).  We would be seeking detention, however, based

4   on both a risk of flight and danger to the community.

5          THE COURT:  But the presumption is for which one?

6          MR. HUDOCK:  As to the danger, your Honor.

7          THE COURT:  I see.  OK.  I got it.

8          So you can proffer the testimony of your witness, and

9   even though I said I want to be concise and get through this,

10  speak at a rate of speed that I can take notes.

11         MR. HUDOCK:  Of course, your Honor.

12         THE COURT:  OK.

13         MR. HUDOCK:  We are proffering the testimony of HSI

14  Agent Leah Ortiz, who is the primary investigator of this

15  offense.

16         The investigation occurred or began back in May of

17  2020 when law enforcement received a National Center for

18  Missing and Exploited Children cyber tip indicating that there

19  had been images of child pornography uploaded to a Dropbox

20  account.

21         A subpoena for the subscriber information of that

22  Dropbox account indicated that the account was accessed by an

23  IP address registered to the defendant at his residence in

24  Miami, Florida, and by a second IP address registered to the

25  Caring Hands Animal Hospital in Miami, Florida.

1        THE COURT:  Could you tell me the name of it again.

2        MR. HUDOCK:  Yes, your Honor.  The Caring Hands Animal

3   Hospital.

4        THE COURT:  OK.

5        MR. HUDOCK:  And he worked there at the time.

6        THE COURT:  OK.

7        MR. HUDOCK:  A search warrant for that Dropbox account

8   linked to the email provided in the tip resulted in over 1,000

9   files of suspected child pornography contained within, in

10  addition to the files that were reported in the original tip.

11       In that account there were folders with terms that

12  were indicative of child exploitation, including the terms

13  infant, baby, CP, which are the initials or abbreviations known

14  for child pornography, incest and sale.

15       Your Honor, as a result of that warrant agents

16  reviewed multiple files, of which we have selected several to

17  detail in the complaint.  Specifically, agents reviewed files

18  and video with the title of OctO3, 2 02 42 AM, which contained

19  a video depicting a naked male infant laying on his back on a

20  pillow sitting on a floor.  In that video an adult male can be

21  seen aggressively kissing the infant on the mouth and trying to

22  put his tongue inside the infant's mouth.  The video then goes

23  on to show the adult male licking and sucking on the infant's

24  exposed penis.  The video is approximately 45 seconds in length

25  and was located in a subfolder in the Dropbox account labeled

1   "Infant."

2       There was also a file entitled, and I am not going to

3   read the full title because it would be too long, but it ends

4   in A747.MP4, which contained a video depicting a male toddler

5   laying down on his back on a bed wearing only a shirt and an

6   adult male performing oral sex on the toddler's exposed penis.

7       The video is approximately one minute and 56 seconds

8   in length and was located in a folder entitled "Baby."

9       In addition to the images and videos of child

10   pornography that were found in the account, agents also located

11   images that they recognized of the defendant in the account.

12       As a result of that search warrant, agents applied for

13   and obtained a search warrant for the defendant's residence

14   that was executed on February 24, 2021.

15       In that search they seized multiple pieces of

16   electronic media, including an iPhone 10X, Serial No. G6 --

17       THE COURT:  I don't need that, really.

18       MR. HUDOCK:  Yes, your Honor.  No problem, your Honor.

19       That iPhone was found in his living room, and they

20   also found a silver iPhone 12 located in his bedroom.

21       Now, the defendant provided the passwords for those

22   devices.

23       A preliminary review of the devices showed multiple

24   files of suspected child pornography and chats that discussed

25   the exploitation of children.  Specifically, agents located a

1    video depicting sexual activity between two preteen boys that

2    the defendant received on February 7, 2021.

3           There was another video located on those devices

4    involving sexual activity between a preteen male and an adult

5    male received on February 18, 2021.

6           THE COURT:  Were these all video images?

7           MR. HUDOCK:  Some were videos and some were pictures,

8    your Honor.

9           THE COURT:  OK.

10          MR. HUDOCK:  The first two that I just described were

11   videos and the next one that I'm about to describe is an image.

12          So finally, there was an image located of a minor male

13   exposing his erect penis received by the defendant on February

14   18, 2021.

15          In the course of their investigation agents located

16   images and data from these phones placing the phones in the

17   Southern District of Florida on February 7th and 18th of 2021.

18          THE COURT:  Excuse me.  You're saying the phones that

19   were in the Southern District of Florida were phones from which

20   the images were sent apparently from the minor boys?

21          MR. HUDOCK:  No, your Honor.  I was just clarifying

22   that the two phones that were seized from the defendant's

23   apartment had images on them that would support the fact that

24   those phones were in the Southern District when they received

25   the child pornography.

1     THE COURT:  OK.  I got it.

2     MR. HUDOCK:  To that end, there was an image created

3  on February 7th with GPS coordinates, placing it near the

4  defendant's residence, and they also located phone locate data

5  for February 18th, placing the phone in Miami-Dade County.

6     Now --

7     THE COURT:  Why is that important, that his phone was

8  in Miami-Dade County at the time?

9     MR. HUDOCK:  In order to show venue, your Honor, for

10  the receipt of child pornography we would need to be able to

11  prove that on the date that those chats occurred the phone was

12  located in the Southern District.

13     THE COURT:  I understand.  OK.

14     MR. HUDOCK:  We would also point out several social

15  media chats that occurred between the defendant and an unknown

16  subject involving the discussion of not only child pornography

17  offenses against minor victims, and I do apologize for the

18  language, Judge, but I do need to detail one of those

19  conversations.

20     THE COURT:  OK.

21     MR. HUDOCK:  As a result of a search of these devices,

22  agents located a social media chat that dated from May 20th of

23  2019 through January 15th of 2020.

24     During that chat the user identified as "DM," which

25  agents were able to identify as the defendant, user of the

1    phone, he states, the Suspect 4 in the conversation asks the

2    defendant:  Seen that kid again yet, to which DM responds:

3    Which one?

4         The suspect then asks:  How many have you played with,

5    to which the defendant responds:  I don't know if you're

6    talking about the teenager I fucked or the kid I was playing

7    wrestle with.

8         The suspect then asks the defendant:  I was talking

9    about the one you was wrestling with.  LOL.  Followed by:

10   Well, both then.

11        The defendant responds:  Oh, nah, I don't live near

12   him.  I was on a trip when that happened.

13        And the person responds:  OK, and follows up with a

14   question of:  What about the teen?

15        The defendant responds:  The teenager I saw about two

16   to three weeks ago, to which the suspect responds:  Nice, and

17   asks:  How old is he?

18        The defendant responds:  He said his family is moving

19   here this summer, so probably more in the future.  He turned 16

20   last week.  I can't believe I've been fucking him for two

21   years.

22        And again, I do apologize for the language, your

23   Honor.

24        So in addition to the images and video that agents

25   located in the chats in which the defendant discusses the

1    sexual abuse of a minor, and that was one chat that we

2    detailed, there were multiple chats across multiple chat

3    platforms.

4         There were also images and video of animal crushing.

5    Agents located several images depicting bestiality on the

6    phones that were taken from the defendant's residence.

7    Specifically, on May 21st of 2019 a chat included an image of

8    the defendant laying naked next to a brown and white dog

9    inserting an object into the dog's vagina.  In addition, a

10   review of the Dropbox search warrant results produced

11   additional images of animal crushing.

12        On May 3rd of 2018 a video was recovered from that

13   Dropbox account showing a black male engaging in sexual

14   activity with a female dog, with GPS coordinate information

15   placing the video at the animal hospital in Miami-Dade County

16   where the defendant worked.

17        Then on April 29th of '19 there was a video of a black

18   male digitally penetrating a female black and gray dog, also

19   with GPS information placing the video at or near the

20   defendant's apartment complex.

21        Your Honor, those are the general facts that we would

22   tender for this case.  We can provide your Honor with

23   additional information -- additional information -- however,

24   there is an additional chat that we would like to outline for

25   your Honor discussing bestiality and then we would tender our

1    witness, Agent Ortiz.

2         Agents located a social media chat from a thread --

3    excuse me.  Let me just confirm -- from May 20th of 2019

4    through January 15th of 2020 with an unknown user, and, again,

5    a person identified as "DM."

6         The thread begins with DM sending several images of

7    digital penetration of a dog's vagina.

8         On May 23rd of 2019, he sent an image of what appears

9    to be a black male engaging in sexual activity with a dog.

10        The following photo sent by Suspect 4 or sent to

11   Suspect 4, excuse me, by DM is of a black male with a chest

12   tattoo, that agents recognized belonging to the defendant,

13   sitting on the floor next to a brown and white dog.  The dog

14   appears to have a dildo placed in its vagina.

15        On May 26th of 2019, the person having the

16   conversation with DM asks:  This is you, to which DM responds:

17   Yea.

18        Suspect 4 states:  Hot AF.  And then asks:  Whose dog

19   and:  Where's the rest?  Followed by:  The cum shot?

20        DM responds:  I didn't take one.  I was keeping a dog

21   that needed a home.

22        THE COURT:  Did you say followed by the cum shot?

23        MR. HUDOCK:  That was a question by the suspect to the

24   defendant, your Honor.

25        THE COURT:  OK.  OK.

1          MR. HUDOCK:  If I may just check my notes here one

2    moment to make sure that I covered everything.

3          (Pause)

4          MR. HUDOCK:  Your Honor, that would conclude our

5    factual proffer.  We would like to point out, though, that the

6    delay for a majority of this case relates to both tracking the

7    GPS coordinate data and also to ensure both the location of the

8    defendant and the safety of the execution of the warrant.  So

9    we don't want to give your Honor any undue impression of why

10   there was a slight delay between now and the date of the

11   execution of arrest.

12         THE COURT:  You mean between February 24th and --

13         MR. HUDOCK:  Yes, your Honor.

14         THE COURT:  -- when this investigation began in May of

15   2020, May of last year, correct?

16         MR. HUDOCK:  That's correct, your Honor.

17         THE COURT:  Right.  OK.  Now, I am going to -- it is

18   great to be able to show your ignorance.  I have been

19   blissfully unaware of animal crushing until I read this, but I

20   have not read the complaint.  Could you please tell me what the

21   evidence is of the defendant engaging in animal crushing and

22   specifically what that is.

23         MR. HUDOCK:  Yes, your Honor, and if it makes it

24   easier for your Honor, the code section that would relate to

25   animal crushing is 18, United States Code, Section 48(a)(1).

1            It makes it unlawful for a person to purposely engage

2    in animal crushing in or affecting interstate commerce and

3    defines animal crushing under subsection (f)(1) as actual

4    conduct in which one or more living non-human mammals is

5    purposely crushed, burned, drowned, suffocated, impaled, or

6    otherwise subjected to serious bodily injury, as defined in

7    Section 1365, and including conduct that if it were committed

8    against a person in the special maritime and territorial

9    jurisdiction of the United States would violate Sections 2241

10   or 2242, which would involve sexual abuse.

11           Specifically, Section 2242(2)(b) prohibits a person

12   from knowingly engaging in a sexual act with another person if

13   that other person is physically incapable of declining

14   participation or communicating unwillingness to engage in the

15   act, and to prove that charge we would have to establish that

16   the defendant knowingly engaged in the act with the victim,

17   that the victim was incapable of appraising the nature of the

18   conduct or incapable of declining participation.

19           THE COURT:  Excuse me for interrupting.  So is the

20   animal crushing here the images that you've already told me

21   about of the penetration of the dogs?

22           MR. HUDOCK:  Yes, your Honor.

23           THE COURT:  Or is it literally a crushing of an

24   animal?

25           MR. HUDOCK:  It is not, your Honor.  It is essentially

1   a statute that is entitled Animal Crushing, but it criminalizes

2   bestiality, and there is one other section that would allow you

3   to commonly read it as such, but that is the theory, your

4   Honor.

5           THE COURT:  I understand.

6           MR. HUDOCK:  And the image in the video depicting

7   insertions both of the defendant's body and objects would

8   constitute the sexual abuse.

9           We would also ask your Honor to take judicial notice

10  of the criminal complaint as well.

11          THE COURT:  I will, and if we continue this and I can

12  go ahead and read it, I just don't have time always to read the

13  complaints before these hearings.  I have certainly read the

14  Pretrial Services report.

15          So did you say that there were videos not only of the

16  defendant inserting objects in animals but also himself

17  penetrating an animal?

18          MR. HUDOCK:  I believe it was fingers, your Honor.

19          THE COURT:  Fingers.

20          MR. HUDOCK:  I would have to go back and check.

21          THE COURT:  OK.  That is what I thought I heard.  I

22  just want to be clear.

23          OK.  Is there anything else in your proffer?

24          MR. HUDOCK:  Not at this time, your Honor.

25          THE COURT:  OK.  So, Ms. Ponton, do you have any

Ortiz - Cross

```
 1    questions for the agent?

 2              MS. PONTON:  Just very few, your Honor.

 3              THE COURT:  OK.  Let's see who that person is.

 4              MR. HUDOCK:  We would tender Leah Ortiz, your Honor.

 5              THE COURT:  So Leah, L-E-A-H, O-R-T-I-Z, and you are a

 6    special agent, ma'am?

 7              THE WITNESS:  Yes, ma'am.

 8              THE COURT:  With what agency?

 9              THE WITNESS:  Homeland Security Investigations.

10              THE COURT:  OK.  And do you solemnly swear or affirm

11    that the testimony you are about to give will be the entire

12    truth?

13              THE WITNESS:  Yes.

14              THE COURT:  OK.  You can put your hand down.

15     LEAH ORTIZ

16         called as a witness,

17         having been duly sworn, testified as follows:

18              THE COURT:  Go ahead, Ms. Ponton.  Am I saying your

19    name right?  Ponton?

20              MS. PONTON:  Yes, your Honor.

21              THE COURT:  OK.

22              MS. PONTON:  Yes.

23    CROSS-EXAMINATION

24    BY MS. PONTON:

25    Q.  Good morning, special agent.
```

Ortiz - Cross

1          Could you please just give me -- do you have any

2   background in sex offenses, sexual addictions, or any clinical

3   background or field experience?  If you could just briefly go

4   through that.

5   A.  No, I do not.

6   Q.  OK.  Your experience at HSI, do you have a task force or

7   something where you are privy to what goes on with these

8   sexual-based chats and child pornography chats?

9   A.  Yes.  I'm part of the ICACT, Internet Crimes Against

10  Children Task Force.

11  Q.  OK.  How long have you been doing that?

12  A.  Just under three years.

13  Q.  OK.  Do you have any other experience dealing with this

14  type of topic?

15  A.  No, just the three years here.

16  Q.  OK.  In your three years, do you have any experience or

17  have you come to know any information regarding the reason why

18  sex offenders or sex addicts or anything of the sort, why they

19  end up committing these types of crimes?  Do you have any

20  experience to suggest if it is based in trauma or in prior

21  history or in adolescents?

22  A.  I do not.

23          MR. HUDOCK:  Your Honor, I would object to that

24  question as irrelevant in this instance.

25          THE COURT:  Right.  Listen, if you want to present

Ortiz - Redirect

1    some of this with your own experts, go ahead, but I don't think

2    this is really helpful to me.

3         MS. PONTON:  OK.

4         THE COURT:  It is not her job to analyze this.  If it

5    is a crime, she has a law enforcement position.  That is my

6    take on it.

7    BY MS. PONTON:

8    Q.  So what I have left, special agent, is I just wanted to ask

9    you, I realize that you have information on videos and images.

10   You do not have any -- was there any information or evidence of

11   actually known offenses committed against children?  Were there

12   any victims that came forward, anything during your

13   investigation that revealed that actual acts did in fact occur?

14   A.  At this time no victims have come forward.  We just have

15   the conversation from Mr. Madden, as AUSA Hudock explained in

16   the complaint or the proffer, that suggests that he has engaged

17   in sexual activity with minors.  At the moment in time that is

18   all that we have.

19        MS. PONTON:  I have no further questions, your Honor.

20        THE COURT:  All right.  Any redirect, Mr. Hudock?

21        MR. HUDOCK:  Briefly, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. HUDOCK:

24   Q.  Agent Ortiz, just as to the last question, is your agency

25   still investigating Mr. Madden to determine if those

1   conversations that he had were supported by actual fact and if

2   he did in fact have contact with minors?

3   A.  Yes, we're still pursuing all those leads.

4   Q.  And was there additional evidence beyond what I read in

5   open court indicating that the defendant had acknowledged

6   contact with a minor?

7   A.  Yes, I believe so.

8           MR. HUDOCK:  OK.  Nothing further, your Honor.  Thank

9   you.

10          THE COURT:  Is there any other government evidence?

11          MR. HUDOCK:  Not at this time, your Honor.

12          THE COURT:  I need just a few-minute break.  I'm

13   sorry.  Then I will be back and we will pick up with the

14   defense.

15          MR. HUDOCK:  Thank you, your Honor.

16          (Witness excused)

17          (Recess)

18          THE COURT:  OK.  Thank you for your patience.

19          Ms. Ponton, what do you want to present?

20          MR. HUDOCK:  Your Honor, if I may, before we proceed,

21   and I neglected to state this at the beginning of the hearing

22   and I do apologize.  I was hoping to ask your Honor to, in

23   addition to taking judicial notice of the criminal complaint,

24   also consider this hearing for the purposes of the preliminary

25   hearing to make a probable cause determination.

1          So if your Honor would be willing to consider that,

2   the United States would have no objection to the defense asking

3   any additional questions they may need to of our witness at

4   this time in order to satisfy their obligations.

5          THE COURT:  This wasn't set for a preliminary hearing.

6          MR. HUDOCK:  I acknowledge that, your Honor, but since

7   we are set within two weeks and the investigation is ongoing,

8   we would request, respectfully, that we be able to just handle

9   both hearings at the same time, if that is OK with your Honor.

10         THE COURT:  I see.  OK.

11         Well, Ms. Ponton, how about that?

12         MS. PONTON:  The only thing, your Honor, is that right

13  now I am on a temporary.  We are kind of going as we go right

14  now.  We are attacking quite a bit.  So in terms of what will

15  happen by the 31st, I don't have information right now.

16         THE COURT:  The question is can we do a preliminary

17  hearing with temporary counsel.  I know we don't arraign

18  someone.

19         MS. PONTON:  I am going to check right now, Judge.

20         THE COURT:  But I have not confronted that question.

21         MS. PONTON:  I don't know if -- it may be possible

22  that we are going to be coming back to your Honor soon.  I

23  don't know if we can kind of hold that thought in abeyance

24  while we figure logistics out.

25         MR. HUDOCK:  Your Honor, if I may.  I can state to

1    your Honor in a situation where the government would fail to

2    file within the 14-day period temporary counsel would

3    inevitably be representing the defendant on a preliminary

4    hearing.  So from our perspective I don't think there is

5    anything barring temporary counsel from acting in this

6    particular situation.

7           THE COURT:  I think that's right.

8           MR. HUDOCK:  The question is probable cause.

9           THE COURT:  I think that's right.  As a practical

10   matter we have had a very detailed presentation of evidence

11   here.  It makes no sense to be doing this twice.  So I am happy

12   to consider this a preliminary hearing.

13          Ms. Ponton, if that opens up any other questioning

14   that you have for the agent -- usually probable cause is really

15   not an issue.  So I would have to go back and I would have to

16   look at the statute, which I cut you off on the animal

17   crushing, the elements of that statute, but I'm impressed by

18   the level of detail of your proffer of what plainly is criminal

19   conduct.

20          MR. HUDOCK:  Your Honor, if you'd like, I can put on

21   the record those elements for you, and I also have the case law

22   that supports an interpretation as bestiality being animal

23   crushing.

24          THE COURT:  OK.  Well, if that is disputed by defense

25   counsel, we could do that.  If it is not disputed and really

1    the issue here from the defendant's perspective is not probable

2    cause to accuse Mr. Madden but, rather, it's a question of his

3    release, then we can move on.

4              MS. PONTON:  So this is one of those moments where I

5    wasn't prepared to answer that question.  In my review of the

6    complaint, the question of whether the bestiality goes under --

7    that was basically something that I do need to spend a little

8    time with.  I'm sure Mr. Hudock is going to provide us with

9    case law.

10             I have no issue with proceeding forward on the

11   preliminary hearing based on the rules, but I would like to

12   save an opportunity for possible argument or some

13   reconsideration or a memorandum of some sort.

14             THE COURT:  I am not sure what you are asking me.  Are

15   you disputing that we are having a preliminary hearing at the

16   same time?

17             MS. PONTON:  No.  No.  No.

18             THE COURT:  OK.

19             MS. PONTON:  What I am saying is there is a particular

20   question as to whether bestiality falls under the definition of

21   animal crushing.  The way the language reads is, does it cause

22   serious bodily injury.  Since there is no information proffered

23   regarding the state of the animals, whether a veterinarian saw

24   the animals, whether there is injury, those are the questions

25   that -- I don't have case law, your Honor, and so I just don't

1    want to defeat my ability to make that argument.  I could

2    support it in a memorandum of law if I find otherwise I guess

3    is what I'm trying to say.

4              THE COURT:  Remember our standard here is probable

5    cause.

6              MS. PONTON:  I know.

7              THE COURT:  It is really low.

8              MS. PONTON:  I'm aware, your Honor.

9              THE COURT:  Your argument sounds a lot more directed

10   towards a question of whether he's in fact liable.  So I

11   guess -- why don't we move forward for right now.

12             I agree that you can hold a preliminary hearing now,

13   that it makes no sense to do this level of detailed

14   presentation twice.  We will come back at the end of this

15   hearing from defense counsel and see where we stand on whether

16   we can resolve the preliminary hearing either by stipulation

17   or, if not, I will simply need to take time to review the

18   elements of the statute and the presentation that's been made

19   to see if I can make that determination.

20             Does that make sense, Mr. Hudock?

21             MR. HUDOCK:  Yes, your Honor.  Thank you.

22             THE COURT:  It at least accomplished your goal that

23   you are not going to do a preliminary hearing on the 31st.

24             MR. HUDOCK:  Yes, your Honor.  Thank you.

25             THE COURT:  So, Ms. Ponton, what do you want to

1    present?

2          MS. PONTON:  OK.  Your Honor, at this time if I

3    have -- I'm just doublechecking on the screen -- if I can call

4    Marilyn Volker.

5          THE COURT:  I do see her.

6          Ms. Volker, your name, I am going to read it.

7    M-A-R-I-L-Y-N, V-O-L-K-E-R, correct?

8          You are muted, Ms. Volker.  There.

9          Can you say something?  I do not hear you.  This is

10   not good.  You are unmuted but I am not hearing you.

11         Your reception is a little -- it looks kind of chopped

12   up.  This is the way of --

13         MS. PONTON:  Maybe I can get Ms. Volker to sign in

14   again and everything and I can proceed with Dr. Samek.

15         THE COURT:  Sure.

16         Ms. Volker, feel free if you'd like to log off and

17   then come back on.

18         Sir, I see your name William, spelled the way we

19   expect it, S-A-M-E-K.  Is that correct?

20         THE WITNESS:  Yes, it is.

21         THE COURT:  OK.  Very good.

22         Would you please raise your right hand, sir.

23         Do you solemnly swear or affirm that the testimony you

24   are about to give is the entire truth?

25         THE WITNESS:  Yes, I do.

Samek – Direct

1          THE COURT:  OK.  Go right ahead, Ms. Ponton.

2     WILLIAM SAMEK,

3          called as a witness,

4          having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MS. PONTON:

7     Q.  Dr. Samek, could you just give us a brief overlap of your

8     experience in sex offender treatment.

9     A.  Yes.  I've been treating sex offenders for more than 40

10    years.  I started out as the director of the sex offender

11    treatment program for DCF at South Florida State Hospital.  I

12    have been president of the Florida Psychological Association.

13    I direct, founded and directed another program called the

14    Florida Sexual Abuse Treatment Program.  I mostly do treatment,

15    but I also do forensic assessments and testifying related to

16    sexual abuse, both victims and offenders.

17         THE COURT:  What kind of doctor are you, sir?

18         THE WITNESS:  I'm a clinical psychologist, licensed as

19    a psychologist in Florida.

20         THE COURT:  OK.  Do you have your Ph.D. or a Sc.D?

21         THE WITNESS:  Ph.D.

22         THE COURT:  I don't know why I asked.  It wouldn't

23    matter to me.  It seemed like a good question.

24         THE WITNESS:  It is a question good.

25         THE COURT:  I'm sure it means something to people in

Samek – Direct

```
 1    your profession.

 2              OK.  So go right ahead, Ms. Ponton.

 3              MS. PONTON:  Yes.

 4    BY MS. PONTON:

 5    Q.  In your experience, Dr. Samek, you do have particular

 6    experience with sex offenders on a, I guess, daily basis, is

 7    that correct?

 8    A.  Yes.  I've also had contracts with both the state and

 9    federal Department of Corrections to treat sex offenders who

10    are on probation or parole or pretrial.

11    Q.  And how long have you been doing that kind of work with

12    Corrections?

13    A.  It goes way back.  Most of my professional life I have been

14    doing that.  I currently have some men in my treatment who are

15    on probation, both federal and state cases on probation now.

16    Q.  Now, I wanted to ask you a little bit about your

17    understanding of research or clinical experience with respect

18    to sex offenders.

19              In working with sex offenders, can you tell this court

20    whether sex offenders are treatable.

21    A.  Yes.  Sex offenders clearly are treatable.  The success

22    rate after therapy, if the proper type, is very high.

23    Certainly it is not 100 percent, but in the work that I've been

24    doing over all these years it's been way over 95 percent.

25    Frankly, it's over 98 percent who are successfully
```

1    rehabilitated, successfully treated.

2            They can be fixed.  It is a long-term treatment

3    process.  It varies depending on the individual, but typically

4    it takes two to five years, sometimes -- not rarely even more

5    than five years before the treatment is completed.

6            The treatment isn't for the sex offending behavior.

7    That I view is a symptom of an underlying personality disorder,

8    and it is really --

9            MR. HUDOCK:  Your Honor, we would object at this time.

10   The testimony that we've heard so far would not go to probable

11   cause as to whether or not the defendant should be detained,

12   only as to this particular witness' experience about whether or

13   not people could be rehabilitated.

14           THE COURT:  Wait a minute.  There is not probable

15   cause whether they are detained, right.  Probable cause --

16           MR. HUDOCK:  I apologize, your Honor.

17           THE COURT:  -- we are talking about our detention

18   hearing right now.

19           I'll hear a little bit.  I'll hear a little bit.  So I

20   will overrule your objection for the moment.

21           This does need to stay very focused.  There are two

22   defendants still waiting for their detention hearing.  My

23   afternoon calendar starts at 1:30, which obviously isn't

24   happening.  This is an important matter.  The point is we need

25   to keep our focus here.

Samek - Direct

| | |
|---|---|
| 1 | This is an argument about the release of the |
| 2 | defendant, right? |
| 3 | MS. PONTON:  Yes. |
| 4 | MR. HUDOCK:  Yes. |
| 5 | THE COURT:  OK. |
| 6 | BY MS. PONTON: |
| 7 | Q.  So if I could just ask you more pointedly.  When is it most |
| 8 | helpful to a sex offender to get treatment?  Would it be as |
| 9 | soon as the issues arise or down the road after sentencing |
| 10 | after a significant time lapse in prosecution and sitting |
| 11 | incarcerated? |
| 12 | A.  Like treating most any disease, the sooner treatment is |
| 13 | started the better off it will be. |
| 14 | Q.  OK.  You have heard the charges thus far.  Do you have any |
| 15 | reason to associate the possibility that based on what you've |
| 16 | heard that -- I'm sorry.  Let me reask that question. |
| 17 | In cases where there is possession of child |
| 18 | pornography or watching it or not selling it necessarily but |
| 19 | just passing it around, do those necessitate that there is |
| 20 | actual involvement in child -- involvement with sexuality with |
| 21 | children? |
| 22 | MR. HUDOCK:  Your Honor, I would renew the |
| 23 | government's objection as to this line of questioning. |
| 24 | MS. PONTON:  It goes to danger, your Honor. |
| 25 | THE COURT:  Wait a minute.  You are asking Dr. Samek |

1  if people who possess child pornography necessarily engage in

2  it?  Is that your question?

3        MS. PONTON:  Correct.

4        THE COURT:  I don't know why that is helpful to me.  I

5  think some people do and some people don't.  There is evidence

6  that suggests the defendant has engaged in sexual activity with

7  young people.  So that is what is useful to me.

8        MS. PONTON:  Well, just to remind the court that there

9  is an investigation but there is no --

10        THE COURT:  There is evidence.  I have been presented

11  with evidence by proffer of a chat that Mr. Madden had

12  referencing the young man who just turned 16 and that he had

13  been having sex with him for the last two years.  Right?

14  That's evidence.  This is not his trial, but I've heard that.

15        So I really think you are making an argument to me

16  that it makes sense for Mr. Madden to be released and be in

17  some sort of intensive therapy and that he won't be a risk, he

18  won't be a danger to other people.  So that is the focus here.

19  That would be helpful to me.

20        MS. PONTON:  Thank you.

21        THE COURT:  OK.

22  BY MS. PONTON:

23  Q.  Dr. Samek, do you know of any actual in-house

24  rehabilitation therapy or do you know if there is any therapy

25  available to someone accused of these crimes in the South

Samek - Direct

1   Florida area where Mr. Madden would be able to attend?

2   A.  There's no program in Florida that is residential or

3   secure.  The treatment in Florida is outpatient.

4            THE COURT:  The treatment in Florida is what?  I'm

5   sorry.  You broke up.

6            THE WITNESS:  It is outpatient treatment.  It is

7   treatment where someone comes into the office but is not living

8   in a secure facility.  They come in for treatment.

9            THE COURT:  OK.  That is helpful to me.  OK.

10  BY MS. PONTON:

11  Q.  Do you conduct that type of treatment, Dr. Samek?

12  A.  Yes, I do.

13  Q.  And are you available to become part of the team that would

14  assist Mr. Madden if he were in fact released out on bond?

15  A.  Yes, I am.

16  Q.  OK.  And your treatment would involve what kind of

17  treatment?

18  A.  It would involve group therapy with other men who have

19  committed similar crimes.  It may or may not also involve

20  individual therapy in addition to that.  That's on a case by

21  case depending on his need.

22  Q.  And are you able to evaluate him once he's released, are

23  you able to accommodate an evaluation by next week if he were

24  presumably released?

25  A.  Yes.  Between Friday of next week and Tuesday of the week

Samek - Cross

1  after that I wouldn't be available, but before Friday of next

2  week and after Tuesday of next week, yes.

3  Q.  OK.

4        MS. PONTON:  I have no further questions of Dr. Samek

5  right now, your Honor.

6        THE COURT:  OK.  So, Mr. Hudock, did you want to ask

7  anything?

8        MR. HUDOCK:  I do have a few questions, your Honor, if

9  that's all right.

10        THE COURT:  Sure.  Of course.

11  CROSS EXAMINATION

12  BY MR. HUDOCK:

13  Q.  Dr. Samek, just so I'm clear about your testimony, you have

14  never had contact with the defendant in this case, Mr. Madden,

15  is that correct?

16  A.  Yes, it is.

17  Q.  And you have not had an opportunity to evaluate him based

18  on his mental state or his personal history, is that correct?

19  A.  I have heard some information about his personal history,

20  but not -- I wouldn't call it that I've done an evaluation of

21  him.

22  Q.  And you've never been able to meet with him in person, is

23  that correct?

24  A.  That's correct.

25  Q.  And in your testimony you indicated that while treatment

Samek – Cross

```
 1   for these types of situations is certainly practical and
 2   possible, it varies on a case-by-case basis, is that correct?
 3   A.  It does vary for the great majority of men.  While they are
 4   in the stage that they are in right now, the fear motivation
 5   keeps them complying with the orders.  If he is released with
 6   the proper orders, the chance is very great that he will do
 7   what is ordered of him for the short term, meaning the period
 8   until trial.  He would very likely comply with the orders.
 9        It is a rare exception that somebody doesn't in a
10   significant way comply with the orders because of the fear.
11   They are obviously and appropriately very frightened at this
12   stage of their life.
13   Q.  Yes, sir.  Did you have an opportunity to read the criminal
14   complaint in this case?
15   A.  No.  I heard you summarize it, but I've not had a chance to
16   read it.
17   Q.  Yes, sir.  Were you able to review any of the images or
18   videos that would have been contained in the defendant's
19   digital devices?
20   A.  No, I have not.  I've seen similar images and movies in
21   other cases, but I have not seen anything of his from this
22   case.
23   Q.  Are you familiar with the content of any of the
24   conversations that Mr. Madden had with other individuals about
25   the sexual abuse of minors upon which we have proffered today?
```

Samek - Cross

A.  Yes.  No, no.  Only the proffer.  Only what you shared today.

Q.  And so based on that and based on your testimony, you cannot say with 100 percent certainty that Mr. Madden would not be a danger to the community, is that correct?

A.  I can never say that with 100 percent security or probability.  I can say it's beyond a reasonable doubt level of probability that he will comply.  But if I were to interview him or see him and talk to him and my opinion were to change from that, I would be happy to notify you and the court immediately.

Q.  OK.

MR. HUDOCK:  If I may have one moment, your Honor, just to check my notes here.

THE COURT:  OK.  Actually, I want to follow up on what you just said, sir, because I have kind of a general notion that mental health professionals like yourself have a legal obligation to report, am I right, if you are aware of someone who you think is a danger, creating a danger?

Let me just ask you, what is your obligation?

THE WITNESS:  Yes.  It's very complicated and I always consult whenever this issue comes up, but the requirement is if I know or suspect that a child is abused, neglected, or abandoned, I'm required to report that.  And there is a new statute that is now about a year, year and a half old that if I

Samek – Cross

1    am of an opinion that someone is likely to seriously injure

2    somebody, an identifiable person shortly or imminently, I'm

3    required to notify police about that.

4              THE COURT:  Seriously injure a person, not an animal,

5    correct?

6              THE WITNESS:  There is nothing that I am aware of in

7    the statute that permits me to breach privilege of a patient

8    because of bestiality.

9              THE COURT:  Right.  Right.  And without giving any

10   details, have you ever done that before, made that

11   notification?

12             THE WITNESS:  No.  I've treated people who have had

13   sex with animals.  I have not --

14             THE COURT:  I'm sorry.  Have you ever made a

15   notification to law enforcement that you have that suspicion

16   that a child would be abused?

17             THE WITNESS:  In that case the requirement isn't to

18   report to law enforcement, it is report to DCF, and, yes, I

19   have.

20             THE COURT:  OK.

21             THE WITNESS:  A number of times.

22             I consider it important not only for public safety but

23   also for protection of my reputation that I comply with all

24   laws.

25             THE COURT:  Of course.

Samek - Cross

1      So what you are telling me is that if the defendant

2   were released and if you were treating him that you would --

3   well, he would be supervised by a probation officer.  If you

4   believed, knew or suspected that a child might be abused by him

5   or that he might seriously injure someone, would you report

6   that to a probation officer?  Would you be agreeable to doing

7   that?

8      THE WITNESS:  I would be agreeable to with the written

9   consent.  I am required to report it to DCF, and I'm assuming

10  they always come with the consent signed so that it's never

11  been a problem with reporting to a probation officer either.

12  As I said, I would verify to make sure that it was legal to do

13  so, that things were signed as they should be.

14      THE COURT:  Right.  But I think what you are saying is

15  that if it were an order of the court that a condition of his

16  release would be that you or any treatment provider had any

17  concern that the defendant was causing -- engaging sexually

18  with any minor or with any animal -- I mean, that could be a

19  condition of his release.  It is up to him if he wants to agree

20  to it.  Then you would be accepting of that condition, am I

21  right?

22      THE WITNESS:  I would, and I would recommend to the

23  court that the order state something like what admissions he

24  makes to me of guilt, admissions that are against his

25  self-interest, that they be privileged but that how he is doing

Samek – Cross

1  in treatment, whether he is progressing, whether he is

2  participating, whether he is talking and if there are any

3  children or animals -- actually, I would say any people or

4  animals that I believe are in risk, at risk at this point that

5  I would be required to report back to the court as well.

6          THE COURT:  OK.

7          THE WITNESS:  It is helpful that he be free to talk to

8  me and not have what he shares with me be used in prosecution.

9  But if he is doing anything or, frankly, if he is not talking

10  about stuff that he needs to be talking about that I be able to

11  report back to the court.

12          THE COURT:  Right.  That makes sense.  I understand

13  from your perspective and from a treatment perspective why that

14  makes sense.

15          OK.  I think I interrupted you, Mr. Hudock.

16          MR. HUDOCK:  Yes, your Honor.  Thank you very much.  I

17  do have some additional questions for Dr. Samek.

18  BY MR. HUDOCK:

19  Q.  Dr. Samek, I wasn't clear and I forgot to ask you about the

20  time line of your involvement with Mr. Madden.

21          Were you retained yesterday, today?  When were you

22  retained?

23  A.  I'd have to check, but I believe it was yesterday.  I don't

24  think it was the day before.  I believe it was yesterday.

25  Q.  OK.  And based on the notes that I have so far, that would

Samek – Cross

1   have -- your representation would have been limited to what was

2   shared with you by defense counsel about this incident, is that

3   correct?

4   A.  Dr. Volker spoke to me first and then I spoke to

5   Ms. Ponton, and then of course today I've heard the testimony.

6   Q.  OK.  So it would have been not until today that you would

7   have known the substance of the charges against Mr. Madden, is

8   that correct?

9   A.  I knew everything before today, save the 14 year old/16

10  year old that he had been involved with.

11  Q.  OK.  And you were hired in this case, is that correct?

12  A.  I've been retained to appear today, yes.

13  Q.  And in order to engage in this plan that you've proposed,

14  that would require an additional retainer to be covered by

15  presumably the defense, is that correct?

16  A.  That's correct.

17  Q.  And so it would be in your financial interest to retain the

18  defendant as a client?

19  A.  Yes.

20  Q.  Do you know how much you've been paid so far?

21  A.  Yes.

22  Q.  Can you please share that with the court.

23  A.  $450.

24  Q.  And is that your hourly rate?

25  A.  Yes, it is.

Samek - Cross

1  Q.  Would that --

2  A.  That is for forensic work.  It is different for clinical

3  work.

4  Q.  What about your hourly rate for testifying here today?

5  A.  It's 450.  That's forensic.

6  Q.  So in order to continue seeing the defendant you would need

7  to have at least $450 an hour for any of those visits?

8  A.  No, no.  If I'm seeing him as a therapist, it is 225 an

9  hour for individual, 75 an hour and a quarter in group.

10 Q.  OK.

11 A.  It is only forensic to do an assessment for court purposes

12 or testimony in court, that kind of thing.

13 Q.  And you indicated that in this particular instance you

14 would not ordinarily be required to report any suspicions of

15 misconduct to law enforcement, simply to DCF, however, you

16 would be willing to do so in this particular case?

17 A.  Yes, and DCF is required by law.  When I report to DCF,

18 they are required to investigate if in fact the perpetrator is

19 someone who is responsible for the welfare of the child, and

20 they always report to court when they deem it worthwhile.

21      If it is not in the jurisdiction of DCF with respect

22 to the perpetrator being not the person responsible for the

23 welfare of the child, DCF is required by law to immediately

24 pass the report on to the police.

25      So the reality is reporting to DCF is always reporting

Samek - Cross

1  to the police, but the technicalities are different.

2  Q.  Just so I'm clear, you would have to report any time you

3  had a suspicion that the defendant either intended to or had

4  had contact with a minor victim, is that correct?

5  A.  No, it's not correct.

6  Q.  Can you share with us --

7  A.  I'm not -- yes.  I'm not required to report intentions,

8  thoughts, wishes, feelings.  I am required to report acts and

9  behaviors.

10  Q.  OK.  So if you became aware of, say, for example, the

11  information in the criminal complaint, you would be required to

12  report that, is that correct?

13  A.  Yes.

14  Q.  OK.  And in this particular instance you would agree that

15  once you become aware of actual acts against a victim, it's

16  arguably too late at that point, is that correct?

17  A.  Too late for what?  It is not too late for law enforcement

18  or protecting the child and others, but it doesn't undo what's

19  happened in the past.  My requirement to protect or to

20  report -- we're getting a bit confused here because my

21  requirement to report under the law is acts that have happened

22  in the past.  However, as a therapist with somebody who is

23  court-ordered into treatment, if I believe they are likely to

24  commit an offense, my first responsibility as a therapist is to

25  work with them and get them to a point where that is not

Samek - Cross

1   likely.  If I don't feel that that is going that way, if I feel

2   that he is still likely to act out, I would immediately notify

3   everyone.  I'd notify family of his, I'd notify probation

4   officers, parole officers.  In a case like this, the court.  I

5   would be happy to notify the state attorney or the U.S.

6   attorney.  Because in my view that is not only protecting

7   children, that is both protecting intended future victims but

8   also protects my client against additional charges and more

9   incarceration.  So I am protecting a number of people by doing

10  that.

11  Q.  I guess the only reason I was concerned is because in your

12  previous testimony, and correct me if I misunderstood you,

13  Doctor, is that you indicated that you would only have to

14  report past instances of misconduct.

15          Is your testimony now that you would report potential

16  future violations if you believed the defendant posed a danger?

17  A.  Yes, and that is not a discrepancy.  I have to report past.

18  Future I don't have to report legally but I do morally.  And I

19  do report.  If I think a child or anyone is at risk of a future

20  crime and I don't think -- and at the end of the day I believe

21  that the crime is likely to occur, I couldn't live with myself

22  if I didn't do more to try to stop it.

23  Q.  I guess the concern for the United States in this

24  particular instance based on your testimony is that you would

25  not be required to report potential future misconduct or

Samek - Cross

1   instances where you believe the defendant posed a threat.

2          So I just want to be absolutely clear.  You are not

3   required to report instances where you believe the defendant

4   could be a threat to children in the future?

5   A.  Could be a threat, not required.  Is a threat, will be a

6   threat, those I believe I would be required, but I would

7   consult with an attorney that works for the psychological

8   association to get clarity whenever I had a question of that

9   sort, whether this particular case requires reporting and how I

10  should do it and who I should report to.  But I take these

11  matters very seriously.  Fortunately they occur very, very

12  rarely.

13  Q.  Again, Doctor, I don't mean to ask a question -- if you

14  don't have the benefit of the knowledge, please let me know,

15  but are you familiar with the facts that the defendant in this

16  case is actually a doctor?

17  A.  My understanding is he is a doctor of veterinary medicine.

18  Q.  The defendant in this case is highly educated?

19  A.  Yes.

20  Q.  And wouldn't you agree, Doctor, that that would give him

21  the ability to potentially hide many of the signs and symptoms

22  of future offense from you, preventing you from being able to

23  share that information?

24  A.  I'm smiling because you don't have to be a doctor to know

25  to lie to protect yourself.  That is part of the treatment

Samek – Cross

1    process.  That is part of what I'm dealing with everyday with

2    all of my patients who are misbehaving.

3             All sex offenders have a desire to lie, and that is

4    one of the real benefits of the group treatment because they're

5    very good as lie detectors of each other and they function that

6    way.  But they're not perfect.  They are darn good.

7    Q.  So you would agree, Doctor, based on both your experience

8    clinically and professionally that in many instances there is

9    both an incentive to lie and a likelihood that offenders would

10   lie about the content of their offending?

11   A.  Particularly when they are in the pretrial stage, but at

12   all times.

13            THE WITNESS:  I'm sorry to run so long, your Honor.

14   The short answer is yes.

15   Q.  OK.  So based on that you would not be able to know with

16   any degree of certainty whether the defendant was or was not

17   offending against any new children if on release, is that

18   correct?

19   A.  I would -- that is not quite correct because I look for the

20   disease.  I look for the dishonesty, the manipulations, the

21   rationalizations, the justifications, the engagement with the

22   other group members.  There are a lot of things I look at that

23   help me reach a conclusion whether somebody is at high risk,

24   medium or low risk.

25   Q.  But you would agree that any risk to another victim would

Samek – Cross

1  be one too many, is that correct, Doctor?

2  A.  Any risk I wouldn't agree because there is always risk.

3  Any action and any further abusing of anybody else, that I

4  would certainly agree with.

5  Q.  All right.

6      MR. HUDOCK:  If I could have one moment, your Honor,

7  just to check my notes here.

8      THE COURT:  Sure.

9      I wanted to ask Dr. Samek, if Mr. Madden were to be

10  released and to be in your care, what would you think would be

11  the frequency of treatment?

12      THE WITNESS:  It would be at least once a week,

13  possibly more depending on what I deem his needs to be.  But in

14  this case there is a team that is at work here and I would

15  discuss with the team and I'm sure the team would want at least

16  once a week.  But I think there is a good possibility with this

17  team they may want more, and I'm willing to do whatever would

18  be in his interest.

19      THE COURT:  A question that I have in my mind, which

20  may not be appropriate for you to answer, but given the nature

21  of the defendant's employment, normally we like people to

22  remain employed when they are out on release, but it seems to

23  me the nature of his employment could really be problematic for

24  him to continue in veterinary work while out on a bond.

25      Do you have any thoughts on that?

Samek - Cross

1              THE WITNESS:  I do, your Honor.  I would suggest that

2       the order of release allow him to work as a veterinary

3       physician as long as there is always somebody else in the room

4       observing while he is with an animal.

5              THE COURT:  Mr. Hudock, did you have anything else?

6              MR. HUDOCK:  Just one more.

7       BY MR. HUDOCK:

8       Q.  Doctor, I need to be absolutely clear.  Do you agree that

9       even one more victim in this situation is one too many?

10      A.  Of course.

11             MR. HUDOCK:  OK.  Thank you.

12             Nothing further, your Honor.

13             THE COURT:  All right.  All right.  Do you have your

14      next witness, Ms. Ponton?

15             MS. PONTON:  Yes, your Honor.

16             Thank you, Dr. Samek.

17             (Witness excused)

18             MS. PONTON:  At this time I would call Marilyn Volker.

19             THE COURT:  OK.  All right.  Ms. Volker, let's hear

20      from you now.  Let's see if it is working.

21             MS. PONTON:  If you could just remove your mute.

22             THE WITNESS:  I'm muted.  Can you hear me?

23             THE COURT:  I can hear you.  Very good.

24             THE WITNESS:  Wonderful.  I'm glad you really were

25      talking to Dr. Samek first because he is really, really the

Samek - Cross

1    important person to ask about this process.

2          THE COURT:  Right.  OK.  Ms. Volker, before we go any

3    further, a couple of things.

4          One, there is a little lag with the video and the

5    audio with you.  It tells me your connection is not as great as

6    I would like it to be.  If you just try to really keep your

7    voice up, we will hear you well.

8          Your name is spelled M-A-R-I-L-Y-N, V-O-L-K-E-R,

9    correct?

10         THE WITNESS:  Correct.

11         THE COURT:  And your position, are you a physician or

12    a psychologist?

13         THE WITNESS:  No.  My undergraduate is in special

14    education and my doctorate is in sexology.

15         THE COURT:  OK.  Before we go any further, would you

16    please raise your right hand and solemnly swear or affirm that

17    the testimony you are about to give is the entire truth?

18         THE WITNESS:  Yes, your Honor.

19         THE COURT:  All right.  Thank you.

20   MARILYN VOLKER,

21     called as a witness,

22     having been duly sworn, testified as follows:

23         THE COURT:  I will leave it to Ms. Ponton to ask you

24    some questions.

25         MR. HUDOCK:  Your Honor, before we even begin I would

Samek - Cross

 1   object to the testimony of Dr. Volker in this particular

 2   instance.  Educational history involving special education

 3   or --

 4            THE COURT:  Well, I think --

 5            MR. HUDOCK:  -- sexology would not be relevant to this

 6   case.

 7            THE COURT:  Ms. Ponton, you have really got to get to

 8   the point.

 9            I have read of you, Ms. Volker, and you have done very

10   interesting work and I think it would be interesting to hear

11   you for a long time, but I don't have a long time.

12            So, Ms. Ponton, I want you to really focus on what is

13   relevant to a condition of release --

14            MS. PONTON:  Yes.

15            THE COURT:  -- for your client.

16            THE WITNESS:  May I just say, the reason that probably

17   I was asked is because in 2017 I saw this particular person and

18   it was about -- because I have a private practice.  I see

19   couples.  It was because he was in a relationship with an adult

20   and talked about compulsion in porn with adults, and I said to

21   him that I will work with you as a couple but you go to an SLAA

22   group, sex and love addicts, which he did for a while, and then

23   he gets a sponsor.

24            Then I didn't see him, especially -- I haven't seen

25   him.  That is why it is important -- I didn't see him since

Samek – Cross

1    2018.  I'm getting to the point because I know what is more

2    important is what Dr. Samek represents.  So I'm part of a team

3    to refer to people as well.

4            Was I concerned with his compulsions?  Yes.

5            MR. HUDOCK:  Your Honor, I would object again at this

6    point.

7            THE WITNESS:  Did he ever --

8            THE COURT:  You can finish your sentence, Ms. Volker.

9            THE WITNESS:  Did I always ask about compulsions?  He

10   talked about adults.  I always ask about many types of

11   compulsions because it's called coping.

12           He never talked about children.  He never talked about

13   animals, which of course I would have wanted to get a team for

14   specifically.  However, he talked about adults and I sent him

15   to -- I still talk with him and his partner while they were

16   together.  Then they separated and I sent him to the SLAA

17   group, and he did go for a while.

18           That's really to the point of what I think.  Then I

19   haven't seen him.

20           THE COURT:  OK.

21           THE WITNESS:  So I want to really be sure that I

22   haven't seen him --

23           THE COURT:  OK.

24           THE WITNESS:  -- since 2018 until he contacted me last

25   week.

Volker - Cross

```
 1              THE COURT:  OK.  All right.
 2              Ms. Ponton, anything else?  I think that was very to
 3    the point.
 4              MS. PONTON:  That is pretty much everything, your
 5    Honor, and I will make the rest of my information through
 6    argument.
 7              THE COURT:  Mr. Hudock, do you want to follow up with
 8    anything?
 9              MR. HUDOCK:  I do, your Honor, if I may.
10              THE COURT:  OK.
11    CROSS-EXAMINATION
12    BY MR. HUDOCK:
13    Q.  Dr. Volker, you indicated that you are neither a
14    psychiatrist nor a psychologist, is that correct?
15    A.  That's correct.
16    Q.  And your doctorate is in education, correct?
17    A.  Doctorate is in education and sexology.  We teach in
18    medical schools, we teach counselors, we teach psychologists,
19    we teach medical folks, and we are always a team, which is why
20    I liked Dr. Samek here on the team.
21    Q.  OK.
22    A.  And Dr. April Young, who could not be here today.
23    Q.  Ma'am, I'd ask you if you could just limit your answers to
24    the questions that I'm asking you here.
25              So as far as your background, though, your doctorate
```

Volker – Cross

 1   was in education and your dissertation subject was in sexology?

 2   A.  Yes.

 3   Q.  OK.  And you saw the defendant from 2017 through 2018?

 4   A.  Yes.

 5   Q.  During that time he never indicated an interest in either

 6   children or animals?

 7   A.  No.

 8   Q.  OK.  So you have not been treating him for being either

 9   attracted to children, zoophilia, anything like that?

10   A.  No.

11   Q.  And during your time with him you had no indication that he

12   was interested in any of those things?

13   A.  Not those two.

14   Q.  OK.  So you would have had no reason to report Mr. Madden

15   during those times to the authorities had he been part of one

16   of these teams that deign to prevent this behavior from

17   occurring, isn't that correct?

18   A.  Correct.

19   Q.  OK.  And in this particular instance you became aware of

20   the charges when the defendant reached out to you?

21   A.  Yes.  Yes, sir.

22   Q.  Have you had an opportunity to review the criminal

23   complaint in this case?

24   A.  No, I have not.

25   Q.  Have you had an opportunity to speak with any of the agents

Volker – Cross

1  or view any of the evidence?

2  A.  I have not.

3  Q.  And so you would not be prepared at this time to provide

4  any additional information or opinion about the defendant's

5  psychological state or his likelihood of reoffending, is that

6  correct?

7  A.  That is correct.

8  Q.  OK.  And you cannot say with any degree of certainty

9  whether or not he would either harm himself, others, other

10  children or animals, is that correct?

11  A.  That's correct.

12  Q.  OK.

13       MR. HUDOCK:  Nothing further.

14  A.  I could not.  I could not.  I could not.

15       MR. HUDOCK:  Thank you, ma'am.

16       THE WITNESS:  You're welcome.

17       THE COURT:  All right.  Ms. Ponton, shall we move on

18  to your next witness?

19       MS. PONTON:  Your Honor, what I have left is I just

20  have a family member who is willing to sign a personal surety

21  bond as well.  The sister of Mr. Madden is on the line, Derrika

22  Harris.  I don't need her to necessarily testify.

23       I will tell you that she lives in Alabama.  Her mother

24  and herself both live in Alabama.  They have absolute

25  willingness to sign on any personal surety bond.

1          I would proffer to this court that she is aware of an

2     incident that occurred in his adolescence, but she doesn't know

3     the details of that nor would we be willing to go into the

4     details here today.  But she could explain to the court that

5     there is a traumatic experience in his life during his

6     adolescence.

7          THE COURT:  I don't doubt that that is true.  I don't

8     think we need to go into it.

9          MS. PONTON:  Yes.  So that is what I have.  Ms. Harris

10    is on the line now.

11         THE COURT:  OK.  All right.  Thank you, Ms. Volker,

12    for being here.

13         (Witness excused)

14         THE COURT:  OK.  So sadly, I think we need to

15    reschedule this for next week to wrap this up.  First of all,

16    it is a preliminary hearing.  I haven't read the complaint.  I

17    haven't pulled up the elements of the offense.  So I wasn't

18    prepared for that.  So I am not going to do that right now.

19    Plus, I will consider the information you have given me.

20         I guess we are to the point, Ms. Ponton, let me hear

21    what the bond is that you're suggesting.  Why don't you tell me

22    specifically because you've thought it through.  What is your

23    request?

24         MS. PONTON:  Your Honor, I did converse with Probation

25    just to confirm what sex offender conditions require from them

1    personally.  So I would request GPS monitoring, a curfew or

2    home detention at home -- he lives alone -- that he not be

3    permitted to have any pets, any animals or access to minors,

4    alone time.  No computer usage, internet, social media.

5    However, I would ask for your Honor to permit computer usage

6    when he is with an attorney.

7              THE COURT:  How would that work with his job?

8              MS. PONTON:  Well, your Honor, to be honest with you,

9    right now the clinic that he is at is no longer -- he is not

10   working there anymore.  He is not going to be able to return to

11   that clinic.

12             THE COURT:  OK.

13             MS. PONTON:  Whether he could get other employment,

14   for example, just working, not as the face of the clinic, but

15   whether he can get another job, we are hoping that that is a

16   possibility.  Again, it would be subject to the condition that

17   Dr. Samek proposed.

18             THE COURT:  OK.

19             MS. PONTON:  And it goes without saying that he would

20   be required to attend mental health counseling and that he

21   place a team into effect and that his evaluations occur within,

22   I don't know if it is 72 hours or something to that effect,

23   business hours.

24             THE COURT:  OK.  All right.  So I think what we should

25   do is I am going to look at my calendar later.  I am going to

1   set this for later next week, probably, I'm thinking, Thursday

2   or Friday, but I can't give you a time right now.  I will

3   schedule it for a followup of the detention and the preliminary

4   hearing.

5           I know I haven't heard your argument, Mr. Hudock, but

6   at least we know concretely what the defense is proposing.

7           You can certainly feel free, any of you, to consult

8   with one another.  If there is the possibility of an agreement

9   between the parties that would be a highly-structured bond

10  package, I am amenable to considering it.

11          I have a lot of concerns about -- if what has been

12  proffered to me about Mr. Madden, then he has hurt a lot of

13  people and animals.  I can only let him out on a bond if I am

14  reasonably assured that is not going to happen.

15          So I am just stating the obvious here.  I am sure you

16  have a grip on the obvious, that releasing him requires -- it

17  is not easy.  It is not easy to do it, but I haven't foreclosed

18  it.  Plainly, he needs treatment, and something that Dr. Samek

19  said made a lot of sense to me.  Mr. Madden should be extremely

20  motivated to engage in real treatment if he is given the

21  opportunity to do so while out on a bond, because there would

22  be a lot of oversight.  So that would be for the greater good

23  long term, but, again, I have to focus on right now and on the

24  conditions of a bond.

25          So this is a long way of saying, Mr. Hudock, I

1    encourage you to speak with defense counsel, see if your mind

2    is open to something that would be extremely structured.  I

3    think we have heard some elements that certainly I would -- if

4    the defendant is going to be out on bond, he is going to be in

5    treatment and he is not going to be working and he is going to

6    be on a GPS and he is going to be on home confinement, and all

7    that makes sense, but there are still some details.

8            Also, Ms. Ponton, you can consult with Probation more.

9    They have people who specialize in these cases.

10           MS. PONTON:  They also suggest a polygraph as to

11   certain, just certain questions.  So they do have a structure

12   for this.

13           THE COURT:  That would be a condition of Probation,

14   that he be polygraphed upon demand by Probation.  It makes

15   sense.

16           So that is where we are.  I don't think we can do any

17   more today.  We did a lot.

18           Anything further from you, Mr. Hudock, at the moment?

19           MR. HUDOCK:  Your Honor, just to be clear that the

20   defendant will be detained until the hearing date set by the

21   court --

22           THE COURT:  Oh, yes.  Yes.

23           MR. HUDOCK:  -- for the purposes of pretrial

24   detention.

25           THE COURT:  Yes.  He is in custody and he is not going

1    anywhere unless I order that he can.  This is now staying with

2    me.

3            MR. HUDOCK:  Your Honor, we would also ask -- I

4    recognize that he is still in custody, but we would ask that

5    your Honor enter an order, albeit temporary or permanent, that

6    he have no contact with any of the victims or witnesses

7    referenced either in the criminal complaint or any other

8    victims or witnesses, as well as minor children.

9            THE COURT:  Yes, I order that.  I order that.

10   Absolutely.

11           His calls are recorded.  He is given notice of that.

12   It would be very foolish from the jail to attempt to do

13   anything like that.

14           So OK.  You know what you could do, Mr. Hudock.

15           MR. HUDOCK:  Yes, Judge.

16           THE COURT:  Do you mind just filing a notice of

17   elements of the offenses.

18           MR. HUDOCK:  Yes, your Honor.

19           THE COURT:  Just kind of a vanilla thing.  I'm sure

20   that Ms. Ponton is not going to disagree with you whatever the

21   elements are.  I think you were referring to a case that

22   interpreted a particular element and you could give me the

23   citation to that case or the page cite for wherever it is you

24   want me to look.

25           So if you just file that, say, by Monday.

```
 1              MR. HUDOCK:  Yes, your Honor.

 2              THE COURT:  The end of the day Monday, just a

 3    statement of the elements.

 4              MR. HUDOCK:  Would you like that citation, your Honor?

 5              THE COURT:  In your filing.

 6              MR. HUDOCK:  OK.

 7              THE COURT:  OK.  Yes, Ms. Ponton.

 8              MS. PONTON:  Your Honor, will I be excusing

 9    Dr. Volker, Dr. Samek, or will we seek to have them for

10    questions regarding possible treatment at the next hearing?  I

11    just wanted to know.

12              THE COURT:  I don't know.

13              MS. PONTON:  OK.

14              THE COURT:  I don't know.  At the moment I don't think

15    so.  It might be good if you have them available by telephone

16    at that time, if that's possible.

17              MS. PONTON:  Yes.

18              THE COURT:  If you speak with Mr. Hudock and he thinks

19    it would be helpful for some particular reason, then that would

20    make sense.  OK.

21              MS. PONTON:  Yes, your Honor.  Thank you so much.

22              THE COURT:  Great.  Thank you, all.

23              (Adjourned)

24

25
```

C E R T I F I C A T E


    I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


March 23, 2021          s/ Joanne Mancari
                        Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com